## Case No. 1,161.

BEALL v. BECK.

[3 Cranch, C. C. 666.] [1]

Circuit Court, District of Columbia. Dec. Term, 1829.

LANDLORD AND TENANT — DISTRESS — BOARDING-HOUSE—PROPERTY OF LODGER—SLAVES.

1. The slave of a stranger, hired to, and in the service and employ of a lodger in a boarding-house, with the consent of his owner, and found upon the premises, is not liable to be distrained for rent due by the boarding-house keeper, being exempted by the broad principle of public convenience.

2. The distinction between an inn and a boarding-house is, that into the former all travellers have a right to enter and demand accommodation; but the keeper of a boarding-house has a right to select his guests.

3. A slave, hired as a servant to a lodger in a boarding-house, is not exempted from distress for rent, on the ground of his being in the actual use and personal service of his master, unless he is so at the time of the seizing of him by way of distress. It must be such an actual use, that the taking of the slave would be, or tend directly to a breach of the peace, even if taken from the tenant himself. The case is strengthened by the fact that the landlord rented the house to be occupied as a boarding-house.

At law. Replevin [by Walter B. Beall] for the plaintiff's slave William, hired to Mr. Easton, who was a boarder at Mrs. Rich's boarding-house, for whose rent, due to Mr. Archer, the slave was, by his order, distrained. The defendant made cognizance as bailiff of William Archer, for $90 rent arrear due by Mrs. Rich.

The plaintiff pleaded: 1st. That the slave was not, at the time when, &c., in the said dwelling-house of Mrs. Rich, as the servant, and in the employment of the said Ann E. Rich, but accidentally, and while in the service of one William C. Easton, to whom the said slave was hired by the said plaintiff; upon which issue was joined. 2d. The same plea with this addition, that there were, at the time when, &c., goods and chattels of the said Ann E. Rich in the said dwelling-house, &c., in which, &c., more than sufficient to satisfy the said rent-arrear, and then and there liable to distress for the said rent. To this plea there was a replication, demurrer, and joinder. 3d. That the said Ann E. Rich, during her occupation and enjoyment

[1] [Reported by Hon. William Cranch, Chief Judge.]

of the said dwelling-house, &c., in which, &c., by virtue of the demise in the said cognizance mentioned, used and followed the trade and business of a common public boarding-house keeper for travellers and strangers, and used the said premises in her said trade and business for entertaining, victualling, and lodging strangers and travellers, and that the said slave was in the employment and service of one William C. Easton, then in the said dwelling-house as a guest and lodger of the said Ann E. Rich, at the time when, &c., and this the said plaintiff is ready to verify, &c. To this plea there was a general demurrer and joinder. 4th. The fourth plea was the same as the third, only charging the locus in quo to be a common inn, instead of a public boarding-house. Upon this plea, issue was joined. 5th. That the slave being, at the time when, &c., hired by the plaintiff to one William C. Easton, was, at the said time, in the said dwelling-house and place in which, &c., in attendance upon the said Easton as his servant and waiting-man; and at the time when, &c., was actually engaged in performing for the said Easton, the duties and services of such servant and waiting-man, and in his, the said Easton's, actual use and personal service, and this the plaintiff is ready to verify. Upon this plea, issue was joined. 6th. That the slave was not the property of the said Ann E. Rich, but of the plaintiff; and that there were goods and chattels of the said Ann, in the place in which, &c., sufficient to satisfy the said rent; and that the said William Archer, knowing that the said slave was the property of the said plaintiff, fraudulently and maliciously ordered and caused his bailiff, the said defendant, to distrain the said slave for his said rent; and this the plaintiff is ready to verify, &c. To this plea also issue was joined.

Upon the issues of fact a verdict was taken, subject to the opinion of the court upon the demurrers, and upon the facts in evidence; upon which, if the opinion of the court be in favor of the defendants, judgment to be rendered in his favor for $65, the rent in arrear, &c.

The facts stated were as follows: "That William Archer rented the premises to Mrs. Rich, to be occupied as a boarding-house, and that she publicly advertised to keep a boarding-house, for the entertainment of all persons, travellers and others, for one or more days, at the will of the guests. That William C. Easton was a lodger and boarder in the said house, and hired, of the plaintiff, the slave in question for his own exclusive service as a domestic servant, and took him into his service, and kept him in the said house, as his exclusive servant, without being under the control of Mrs. Rich, although, by permission of Mr. Easton, he occasionally rendered her services when not engaged in his master's business. That Mr. Easton paid for his hire, and clothed him.

That when the bailiff came to levy the distress, he was informed by Mrs. Rich that the slave was not her property, but was the property of the plaintiff, and was the hired servant of Mr. Easton, and exclusively in his employment, and that there were goods enough, the property of Mrs. Rich, on the premises, to satisfy the rent."

Mr. Wallach, for the defendant.

All personal property on the premises, with a few exceptions, is liable for rent. It is immaterial whether there were sufficient goods of the tenant on the premises or not. The only excepted cases are upon the principle of trade and commerce. A coach at public livery, and goods of an inmate at a public inn, are not exempt. Francis v. Wyatt, 3 Burrows, 1498. The reason why a horse at an inn is not liable to distress for rent, is, that the innkeeper is bound to receive him and has a lien upon him for his food. Robinson v. Walter, 3 Bulst. 269; 8 Petersd. Abr. 424; Francis v. Wyatt, 3 Burrows, 1498; Gorton v. Falkner, 4 Term R. 568; 7 Serg. & L. 356; Ham. N. P. 375.

Mr. C. C. Lee, and Mr. Jones, for the plaintiff.

Originally, non-payment of rent or services, was a forfeiture. Afterwards the profits only could be seized, not any thing necessary to enable the tenant to perform the service or pay the rent, such as beasts of the plough, &c. Bradb. Dis. 211. Next came the principle of benefit to trade, such as meal at the mill, a horse at the market, or at pasture. 9 Vin. Abr. 144. Goods on a wharf, or in a warehouse on storage. Thompson v. Mashiter, 1 Bing. 283. Cheese in a cart stopping at a private house. Gisbourn v. Hurst [1 Salk. 250]. A loom in actual use, or if there be other sufficient distress. Simpson v. Hartopp, Willes, 514. Goods at auction. Himely v. Wyatt, 1 Bay, 102. A slave accidentally on the premises. Bull v. Horlbeck, Id. 301. A hair-dresser's apprentice. Phaelon v. McBride, Id. 170. But all these exemptions rest on the broad basis of public inconvenience. Gilman v. Elton, 3 Brod. & B. 75, 6 Moore, 243; 8 Petersd. Abr. 423, 425; and Van Ness v. Pacard, 2 Pet. [27 U. S.] 137. The case of the goods of lodgers in a public boarding-house comes within the same principle; for the trade of keeping a boarding-house, so necessary for the accommodation of the public, especially at the seat of the government, would be broken up if the goods of the lodgers should be liable to distress for rent.

CRANCH, Chief Judge, delivered the opinion of the court, (THRUSTON, Circuit Judge, dissenting.)

1. Upon the first issue, the jury has found "that the slave was not, at the time when, &c., in the said dwelling-house, as the servant and in the employment of Mrs. Rich,

but accidentally, and while in the service of one William C. Easton, to whom the said slave was hired by the plaintiff." This finding, however, is subject to the opinion of the court upon the facts in evidence, which are agreed to be as before stated; and the question for the court upon this issue is, whether the verdict is justified by the evidence. We think it is not; because it does not appear that the slave was accidentally upon the premises, at the time of the distress, but was there as the servant of Mr. Easton, who was then a boarder and lodger in the house, and kept the slave there as his exclusive servant. This plea was probably drawn with a view to the case of Bull v. Horlbeck, 1 Bay, 301, where the jury found a verdict for the plaintiff, the owner of the slave, against the opinion of a majority of the court, who instructed the jury, that the slave of a stranger found accidentally on the premises, is liable to distress for rent; and the reporter adds, that the verdict has been acquiesced in, and the case often relied upon since. In that case, a distinction was taken between cattle and slaves; because the master cannot confine his slaves, as he can his cattle; and it was also said that the common law never contemplated this kind of property. The principle upon which that case was decided by the jury was, the public convenience. The word "accidentally" in that case means without the license of the master; which was not the case with Mr. Easton's servant. He was not, therefore, in the house accidentally within the meaning of the case of Bull v. Horlbeck.

2. The second plea of the plaintiff is like the first, with this addition; that there were, at the time of the distress, goods and chattels of the tenant, in the house, more than sufficient to satisfy the rent in arrear, and then and there liable to distress for the same. To this plea the defendant replied; concluding with this traverse, namely: "Without this, that the said slave was not at the time when, &c., in the said dwelling-house, as the servant of the said Ann E. Rich, but accidentally, and while in the service of one William C. Easton, to whom the said slave was hired by the said plaintiff; and that there were, at the time when, &c., goods and chattels of the said Ann E. Rich, in the said dwelling-house, &c., more than sufficient to satisfy the said rent-arrear, and then and there liable to distress for the said rent, &c." To this replication there was a general demurrer and joinder. Upon this demurrer the court is confined to the facts stated in the pleadings. In considering the validity of the defendant's replication, the court cannot take the inducement to the traverse as true, because the defendant, by tendering an issue upon the allegations of the plaintiff's plea has prevented the plaintiff denying the matter of inducement to the defendant's traverse. The traverse is to a material part of the plaintiff's plea, and is well taken; there

is, therefore, no fault in the defendant's replication; nor is there any suggested in the cognizance. We think, therefore, that the judgment upon this demurrer ought to be for the defendant.

3. The third plea, in substance, is that Mrs. Rich, during her occupation under the demise, used and followed the trade and business of a common · public boarding-house keeper, for entertaining, victualling, and lodging travellers and strangers, and used the said premises in her said trade and business; and that the slave was on the premises, in the service and employ of one of her lodgers and guests, then in the house. To this plea there is a general demurrer and joinder. The question arising upon this demurrer is, whether a slave of a stranger, hired to and in the service and employ of a lodger in a boarding-house, with the consent of his owner, and found upon the premises, is exempt from distress for rent, there being no other property upon the premises liable to distress. All the exceptions to the general rule of liability are founded upon the public inconvenience which would attend its application in particular cases. The general rule itself was adopted to counteract the fraud of tenants, and to prevent that litigation which would arise if the question of title to the property was to be tried in every case of distress. One broad rule, therefore, was laid down, that every thing found upon the premises should be liable for the rent; and as every person was bound to know the rule, it would be his own fault if he permitted his goods to be in such a situation as to be liable to seizure. But there were cases of necessity and accident which would, sometimes, place a man's goods in that situation against his will. These ought to be provided for. Such is the necessity of sending corn to a mill to be ground. In this case the corn would not be voluntarily nor negligently subjected to the power of the landlord. The owner of the corn and his family must not starve for want of meal. The corn, therefore, is excepted from the general rule. The corn could not be carried without a bag, &c., nor conveniently without a horse. The bag and the horse, therefore, are equally protected under the plea of necessity. The case of a common inn is also a case of necessity. The weary traveller must have repose. He is obliged to place his goods upon the premises of some landlord. Other cases, although not of such apparent necessity, are excepted on the ground of public utility and convenience. Thus cloth sent to the tailor's to be made up into garments—a horse sent to the farrier's to be shod—a carriage at a coachmaker's to be repaired—goods at a market, or on the way, and the carriage and horses which convey them;—these, although bordering on the plea of necessity, are yet, more properly, arranged under the principle of public convenience. It is a great conven-

ience to the public that these trades should exist, and that goods should be brought to market; but the privilege of the landlord would prevent people from employing these tradesmen, and from bringing goods to market. So far, therefore, that privilege is restrained by law. The instances cited in the books are only examples of the general principle of public convenience. Wherever the privilege of the landlord would destroy a lawful trade or occupation which is useful to the public, it is restrained by law. The same principle protects the tools of the mechanic and the books of the scholar, the averia carucae, and the implements of husbandry, so long as other distress may be had. It extends also to the protection of trade and commerce. Thus goods in the hands of a factor or broker, or vendue-master, to be sold, or in a warehouse upon storage, or upon a wharf on wharfage, are exempt from the distress of the landlord. It is said that the principle is confined to the benefit of trade and commerce; but trade and commerce are only instances of the application of the general principle of public convenience, which is the broad ground of all the exceptions. The keeping of a boarding-house is not only a benefit to trade and commerce in the more general acceptation of those terms, but is, of itself, a trade. One of the legal definitions of trade is, "a way of living." It is an honest and a lawful occupation, and is useful to the public, especially in a city like this, where there must of necessity be many temporary residents. If the trunks and clothes of the lodgers should be liable to distress for rent in common boarding-houses, it may be said in the language of Lord Mansfield, in Francis v. Wyatt, 1 W. Bl. 485, in regard to livery-stables, "they will all be deserted and undone; for no prudent man will make himself liable to such a hazard." So the privilege of the landlord, if not restrained in this respect, would destroy this lawful trade of keeping a common boarding-house—this way of living—which would be a great inconvenience to the public; for then all temporary residents would be obliged to depend on private hospitality, or to lodge at a common inn, where the innkeeper is bound to receive all sorts of guests. But the case of Francis v. Wyatt, 3 Burrows, 1499, is relied upon to show that goods of a lodger in a common lodging-house are liable to distress for rent. That was an action of replevin, for a chariot standing at livery in a coach-house belonging to a common livery-stable, distrained for rent due by the keeper of the stable. The case was twice argued by counsel of very high standing; and Mr. Blackstone, who argued on the side of the landlord, thought that he fortified his argument, by saying that the case did "not differ at all from that of goods put into a common lodging-house, and there distrained by the landlord for rent in arrear." That cause does

not appear to have been actually decided; but the opinion of the court was intimated so strongly against the plaintiff that he declined a third argument, which the court would have granted him. In the report of the case, however, in 1 W. Bl. 485, it is said that judgment was rendered for the defendant, upon the ground of its being a "part of the profits of the premises;" following the idea suggested by Mr. Blackstone in his argument, that the owner of the chariot was to be considered as an under-tenant to the stable-keeper. However, the counsel for the plaintiff seem to have had the better of the argument upon principle; and the ground which they took has been supported by subsequent judges, as in the case of wharfage, (Thompson v. Mashiter, 1 Bing. 283,) and in the case of factorage, (Gilman v. Elton, 3 Brod. & B. 75.)

The opinion of the court in Francis v. Wyatt seems to have been founded rather upon the technicalities than upon the principles of the law. Lord Mansfield, in that case, said, "that whatever may be the law of the case, it is worth the defendant's while to consider the consequences of such a distress, which will ruin his estate. For if it should be determined that carriages and horses, standing at livery, are liable to be distrained by the lessor for rent, the livery-stables will be deserted and undone; for no prudent man will make himself liable to such a hazard; therefore let the case stand over for further argument, and let the defendant, in the mean time, seriously consider how far, in prudence, he ought to press the question." 1 W. Bl. 485. He could hardly have used stronger language to show that the case was within the general principle of public convenience; and if that case had happened after the case of Gilman v. Elton, [supra,] it would probably have been decided upon the same principles which governed the latter. He admits that the privilege of the landlord, if enforced, would ruin the trade; and it is upon that very ground that the exception rests in favor of trade and commerce. A man must have with him, wherever he goes, some articles of indispensable necessity, such as clothes, &c., things of daily use for his personal comfort and convenience; if he is not to be protected in the enjoyment of these, at a boarding-house, he must abandon it; and the trade, or occupation, as a means of living, will be destroyed. If these are protected, the trunk which contains them must share in the same protection. How far will this principle lead us? It would be difficult to draw the line around articles of necessity only; for what would be considered as necessary to one man might be considered superfluous to another. The line is not well defined between articles of necessity and articles of comfort. The principle which governs these cases seems to require that the line should extend to such articles of personal convenience and comfort, the property of the lodger, as are in his or-

dinary use. The principle of public convenience goes to the absolute exemption of all articles within its reach. Thus, the cloth at the tailor's, the horse at the farrier's, the corn at the mill, the goods at the factor's, or in the warehouse, or upon the wharf, are all absolutely protected, whether there be or be not sufficient goods of the tenant on the premises liable to distress. The plea states that the slave was in the service and employ of the lodger, at the time he was taken. In such case, we think the slave was protected by the general principle of public convenience, and that the case may even be brought within that branch of the general principle which relates to trade and commerce.

The case of Himely v. Wyatt, 1 Bay, 102, was decided by a superior court of South Carolina forty years ago. It was replevin for goods sent to a vendue warehouse for sale, and distrained by the landlord for rent. The court decided that they were protected under the principle of public utility and convenience; and Mr. Justice Waties, who delivered the opinion, said: "The reason why a stranger's goods are subject to distress is, because infinite frauds would be otherwise practiced upon a landlord; and his summary remedy, in this case, might at any time be defeated by a collusion between his tenant and a stranger. All goods, therefore, found on the premises, belonging to strangers or tenants, are generally distrainable. They are presumed to be the property of the tenant, because in his possession. There is no instance in which possession is regarded so much, as the evidence of property, as in this, to preserve the right of the landlord from fraud and imposition. This appears to be the sole object of the law, and therefore admits of exceptions when this mischief does not occur. For when the possession of the goods by the tenant holds out no fallacious security to the landlord, but they are known to belong to a stranger, in that case they are privileged from distress; as in the case of a horse at an inn, or in a smith's shop to be shod, cloth at a tailor's, and sacks of corn in a market or mill, &c., these are privileged and protected for the benefit of trade; but, in my mind, it is as good a reason that the property (notwithstanding the immediate possession is in the tenant,) is known to the landlord not to belong to the tenant, but to his customers. No presumption of property can arise from the possession, and therefore the landlord is not deprived of any security he may have trusted to in them for the payment of the rent. With respect to the present case, all the different reasons for an exemption apply with great force. The defendants, when they leased their house to a vendue-master, could never have had in contemplation any remedy they might have against the goods of various persons which might be lodged with him for sale. They must have known that these were not his property, and must have relied on other re-

sources for the recovery of their rent. Considering then the well-known use of vendue stores as the depositories of the goods of strangers only, and which are placed there, as it were, by the authority of law; and considering also the public convenience and utility of them, there appear to me the strongest grounds for extending to them the protection of the law."

So also in the case of Phaelon v. McBride, in the year 1791, 1 Bay, 170, which was replevin for the plaintiff's slave, bound apprentice to a hair-dresser, and distrained for rent due by the hair-dresser to his landlord. "The court was unanimously of opinion that the negro boy was not liable to be distrained, upon the principle, that goods in the way of trade are exempted." And they said, that "the case of Himely v. Wyatt was adjudged upon wise and legal principles;" "and that it would be hard and unreasonable, under those circumstances, to make the property of a third person liable for the default of a tenant."

So also in the case before mentioned, of Bull v. Horlbeck, 1 Bay, 301, although a majority of the court (against the opinion of Judge Bay) decided that a slave of a stranger, accidentally found on the premises, was liable to a distress for rent, yet the jury found a verdict against the opinion of the majority, which verdict was acquiesced in, and has often been relied upon since.

So also in the case of Gilman v. Elton, 3 Brod. & B. 75, in which the court of common pleas, in England, decided in the year 1821, that the goods of the principal, in the hands of the factor, cannot be distrained for the factor's rent. Dallas, C. J., said—"The general right of landlords to distrain is clearly protected in point of law; and I agree that, whatever is found on the premises is, prima facie, taken as belonging to the tenant. The rule grows out of the relation of landlord and tenant, and out of the nature of the thing itself; for all such rules are of simple origin. But rules which are of simple origin, if very general, become in time, and from change of circumstances, inconvenient, and thence subject to exceptions. Exceptions to this general right of distress arose at a very early period, and have ever since been recognized by the courts." And after citing the words of Mr. Justice Ashurst, in Gorton v. Falkner, 4 Term R. 568, in which he states the foundation of the landlord's right to distrain the property of a stranger on the premises to be, "that the landlord is supposed to give credit to a visible stock on the premises;" and that it is founded, also, on public convenience and the prevention of fraud; and that "the exceptions out of the general rule are all of them tending to the benefit of trade and commerce, and general advantage;" he says—"The rule was evidently founded not on natural, but artificial arrangements. It was a rule to prevent a particular species of inconvenience, which would other-

wise have arisen. But as it was found that this rule, when universally enforced, created another kind of inconvenience, extensive in its nature, exceptions were necessarily introduced. In like manner, therefore, and on the same principle of public convenience, a rule has been adopted in favor of trade and commerce; and, as the landlord is protected under the general right of distraining, so goods of a certain description, and in certain situations, are protected in favor of trade and commerce." Again, he said—"The public convenience runs through all the cases of exception. And, on general principle and analogy, this question comes within the scope of those decisions." Mr. Justice Park, in the same case, said—"The instances mentioned under the exception as to trade, by Lord Coke, are not put as limiting or comprehending the whole exception, but merely by way of illustration. The principle of the exception is admirably put by Lord Holt, in 1 Salk. 250; and his language shows that the exception was not established for the benefit of the individual, but of trade in general. The case in Cro. Eliz. 549, Read v. Burley, is strong to show that it is the trade which is favored, not the individual." Mr. Justice Burrough, in the same case, said—"This case is to be decided on principle; and on the principle of all the decisions. From the earliest times, these exceptions to the general right of the landlord to distrain, have existed; the question, therefore, is, whether this case falls within the principle of the exception in favor of trade." In none of the cases has that principle been put as if in favor of any particular trade, but for the advantage of trade in general. And Mr. Justice Richardson said—"The advancement of trade equally requires that goods should be placed in the hands of a factor for sale, as that they should be placed in the hands of a carrier for carriage." "The instances enumerated by Lord Coke, under the exception in favor of trade, are only put by way of example, and the present case falls clearly within the principle of the exception."

So in the case of Thompson v. Mashiter, 1 Bing. 283, where the goods of the principal, which had been put by the factor into the warehouse of Ramsay, a wharfinger, were, upon the same general principle, held to be exempted from distress for rent due for the wharf and warehouse. Dallas, C. J., said, "that the case is the same as if the owner had sent them immediately to Ramsay's, where, on the broad principle of public convenience, I think they were not liable to distress." Mr. Justice Park said—"The cases were all considered in Gilman v. Elton; and the general principle laid down in that case is applicable to the present. The principle there laid down was, that certain exemptions of goods from distresses were permitted, not on account of the character of the individual in whose hands the goods were deposited, but for the benefit of trade. On that general

ground we now decide; and not on the ground that Ramsay was the servant, or stood in the place of the factor. The instances put by Lord Coke are merely illustrative, but they apply in principle, though none of them, perhaps, in terms." "Therefore, keeping to the broad and general principle of convenience, and benefit to trade and commerce, I think these goods ought not to have been distrained."

These cases show that the principle is broad enough to cover a slave, the personal servant of a lodger, at a common boarding house; and that the principle, if it applies at all, goes to the total exemption of the property thus situated, whether there be other sufficient distress or not. We are, therefore, of opinion that the demurrer to the third plea of the plaintiff ought to be overruled.

4. The fourth plea of the plaintiff was the same as the third, except charging the locus in quo to be a common inn. Upon this plea issue was joined, and found for the plaintiff, but subject to the opinion of the court, whether the facts justified the verdict. It is not clearly stated in the books what are the essential requisites of a common inn, commune hospitium, or what distinguishes it from a common boarding-house. It appears, however, by the Registrum Brevium, 105, (see Fitzh. Nat. Brev. 104, B, and Co. Ent. 347,) that common inns must be kept "ad hospitandos homines, per partes, ubi hujusmodi hospitia existunt, transeuntes;" that is, for the entertainment of travellers passing through those parts of the country where the inns are. Calye's Case, 8 Coke, 32. And "it is no way material that he should have any sign before his door or not, if he make it his common business to entertain passengers." 1 Hawk. P. C. c. 78, § 2, p. 452; Rex v. Collins, Palmer, 373. And, in section 4, c. 78, Hawkins says—"Also it seems to be settled, at this day, that any person may lawfully set up a new inn, unless it be inconvenient to the public in some of the respects taken notice of in the first section, and that he has no need of any license from the king for this purpose; for the keeping of an inn is no franchise, but a lawful trade, open to every subject. But if an inn degenerate into an ale-house, by suffering disorderly tippling, it shall be deemed as such." It is true that, by the act of Maryland, 1790, c. 24, ordinary keepers are required to take out an annual license; but the eighth section, by imposing a fine on any person "who shall presume to keep ordinary without a license," shows that an ordinary may exist without a license. The intent of the party, manifested by his acts, must decide whether the house is kept as a common inn, into which all travellers have a right to enter and demand accommodation; or a boarding-house, in which the keeper has a right to select his guests. The statement of facts shows that Mr. Archer rented the premises to Mrs. Rich, to be occupied as a boarding-house; and she publicly

advertised to keep a boarding-house. It is, indeed, stated to be for the entertainment of all persons, travellers and others, for one or more days, at the will of the guests; but still she advertised it as a boarding-house, not as an inn, probably intending to reserve to herself a right to select her guests. We think, therefore, that the verdict of the jury upon this issue is not supported by the evidence.

5. The question arising upon the verdict found in favor of the plaintiff upon the fifth plea, is, whether the verdict is supported by the state of the facts. The matter found by the verdict, upon this issue, is, that at the time the slave was taken he was "in attendance upon the said W. C. Easton, as his servant and waiting-man, actually engaged in performing for him the duties and services of such servant and waiting-man, and in the said Easton's actual use and personal service." We think this verdict is not supported by the evidence; for it does not appear, by the statement of facts, that the slave, at the time of caption, was in the actual use of Mr. Easton. It is only stated that, "when the bailiff came to levy the distress, he was informed by Mrs. Rich that the slave was not her property, but was the property of the plaintiff, and was the hired servant of Mr. Easton, and exclusively in his employment." We do not think that it can be, from that, inferred that the slave was in the actual use of Mr. Easton at the time he was taken, within the meaning of the rule of law, that goods in the actual use of any person cannot be distrained. It is a rule which applies to the goods of the tenant himself, as well as to those of a stranger; and implies such an actual use, that the taking thereof would be, or tend directly to, a breach of the peace.

6. The verdict, on the issue joined on the sixth plea, finds that the slave was the property of the plaintiff; that there were goods of the tenant on the premises sufficient to satisfy the rent; and that the landlord, knowing the same, fraudulently and maliciously caused the defendant to distrain the slave. The question arising upon the verdict on this issue is, whether it is supported by the facts stated. We think it is not; for fraud and malice, which are the gist of this plea, are not to be presumed, but ought to be clearly proved. The only circumstance stated in this plea, from which fraud or malice could possibly be inferred, was the knowledge of the landlord that the slave was the property of the plaintiff, and that there were goods enough of Mrs. Rich's to satisfy the rent. But there might be other motives to induce him to distrain the slave; and that charity which the law itself demands, in respect to an allegation of fraud, requires us to presume the motive to be good until the contrary appears.

We have, so far, considered the case as it appears upon the pleadings, compared with the statement of the facts. But there is no one of the pleas which brings into view the whole merits of the case. The verdict for the plaintiff has been rendered, "subject to the opinion of the court upon the demurrer, and upon the facts in evidence; upon which, if the opinion of the court be in favor of the defendant, judgment is to be rendered in his favor for $65, the rent in arrear."

The facts in evidence were substantially as follows: That the landlord rented the premises to Mrs. Rich, to be occupied as a boarding-house, and that she publicly advertised to keep a boarding-house for the entertainment of all persons, travellers and others, for one or more days, at the will of the guests. That, at the time when, &c., W. C. Easton was a boarder and lodger in her house, and hired of the plaintiff, the slave in question, for his own exclusive service, as a domestic servant; and took him into his service, and kept him in the said house, as his exclusive servant; and that while the said slave was so in the said house, as the exclusive servant of Mr. Easton, and in his exclusive employment, he was, by the order of the landlord, distrained for rent due by Mrs. Rich to the landlord. That at the time of making the distress, the defendant was informed by Mrs. Rich that the slave was the property of the plaintiff, and was the hired servant of Mr. Easton, one of her boarders, and exclusively in his employment. The fact is also stated, that there were goods enough the property of Mrs. Rich, upon the premises, to satisfy the rent.

The question then is, whether, if these facts had been formally pleaded, the plaintiff would be entitled to recover in this action. It is evident that all the reasons which we have before urged, in support of the opinion expressed upon the demurrer to the third plea, are of equal weight upon the merits of the case as here stated; and in addition thereto are the important facts that there were other goods upon the premises, the property of the tenant, sufficient to satisfy the rent; and that the bailiff was informed, at the time of the distress, that the slave was not the property of the tenant, but of the plaintiff, and in the exclusive service of Mr. Easton, a boarder and lodger in the house. These additional facts, we think, removed all doubt, with respect to the plaintiff's case, even if the court should have erred in its opinion upon the demurrer to the plaintiff's third plea. The circumstance that the landlord rented the house to be occupied as a boarding-house is very important. It is prima facie evidence of his assent that the lodgers should place upon the premises such articles as were necessary for their comfort and convenience, and that he knew they were not the property of his tenant. They held out to him no deceitful evidence of security for his rent; and he could not, with a good conscience, have relied upon them as a fund out of which the rent was to be paid. Even if there had not been sufficient property of the tenant on the premises to satisfy the

rent, it would have been unconscionable, if not fraudulent in him, to have distrained this slave, after having been informed that he was the property of the plaintiff, and was the personal servant in the exclusive employment of one of the lodgers and boarders in the house; and to do it with that knowledge when there was sufficient property of the tenant liable to his distress, was evidence from which the jury might have inferred malice, and perhaps fraud. It would be like the case of Fowkes v. Joyce, 2 Vern. 129, where a grazier, driving sheep to London, was encouraged by the tenant, to put his sheep into the close for one night, which he did, with the consent of the landlord, who distrained them for rent due by the tenant. This distress was adjudged valid at law, but the grazier was relieved in equity upon the ground of fraud; and the reporter says the court looked upon it as a fraud and contrivance in the landlord, to subject the sheep to his distress. Saunders, in his note on page 290, [3 Saund.,] speaking of that case, says, "And it should seem that, at this day, a court of law would be of opinion that cattle belonging to a drover, being put in a ground, with the consent of the occupier, to graze only one night, in their way to a fair or market, were not liable to the distress of the landlord for rent."

Upon the whole, therefore, we are of opinion that judgment should be entered up for the plaintiff upon the defendant's demurrer to the plaintiff's third plea; and that the verdict, not being supported by the facts in evidence, upon any one of the issues, must be set aside, with leave to the plaintiff to put in a plea embracing all the facts in evidence, showing the whole merits of the case, unless the plaintiff should choose to rely upon the judgment in his favor upon the demurrer; in which case he will be permitted to withdraw the pleas upon which the issues of fact have been joined, and take judgment upon the demurrer.

THRUSTON, Circuit Judge, dissented.